And the court wishes to recognize the generous contribution of our visiting Judge William Young from the District of Massachusetts. He's normally trying cases in Boston and we have borrowed him to assist us here today. We're very grateful for his willingness to do this as extra work, so welcome to you, Judge Young. Honored to be here. The panel has before three cases being argued. There is a fourth case being submitted today without argument on the briefs, namely Appeal No. 2007-3327, Bennett v. Merit System Protection Board. On the argument calendar, we'll hear argument first in Meza v. Department of Homeland Security, Appeal No. 2007-3150. Mr. McAllister, good morning to you. Welcome to the court. Please proceed. Good morning, Your Honor. To please the court, counsel, it is the petitioner's respectful position that the board's decision in this matter in upholding the removal of Mr. Meza is arbitrary and depreciate based on the board's rejection of the credible and probative scientific evidence that was presented at the hearing. A closer review of the decision... When you say rejection, I'm not sure what you mean. I didn't understand that any evidence proffered by you, your side, was excluded. What happened was the adjudicator, the fact finder, found other evidence more persuasive than your evidence. Isn't that the right way to characterize it? Yes, but I believe it's based on the distortion of the testimony at the hearing. I'd like to give an example of that. During the examination of the petitioner's expert witness, whose credentials I've outlined in great detail in the brief, he was asked to explain to a reasonable degree of medical certainty and scientific certainty his opinion about the that those results in comparison with the October 31st, 2005 hair follicle analysis made that September 19th, 2005 analysis an outlier. And he went on to explain that scientific... How does that get us to distortion? You said the testimony was distorted. That's a very strong word. The fact finder misstated what the testimony was? What do you mean distorted? The fact finder discarded the probative testimony regarding the historical facts of this case. What she focused on or the board focused on was a hypothetical question, and it's found in the conclusion portion of the decision, whereby the judge states, well, even if I determined that the hair follicle analysis is accurate, I'm going to discount that, disregard that, because the petitioner's expert witness admitted during examination that a one-time consumption of cocaine may end up with a result of a negative finding in the hair follicle analysis. But that's an editorialization of that expert witness's full answer. The complete answer was it is possible, but it's a very low probability. So that portion of the answer was not recited in the decision. But isn't the fact finder able to weigh the evidence and determine what weight it will provide for certain evidence, what will not? The hair follicle test really was not an accepted way to arrive at a proper result. It's not accepted in the scientific community. My understanding is it is accepted in the scientific community. But not for the purposes for which it was submitted with regard to the residual type of cocaine that might be still found in the follicle. Well, there's two different types of results that are expected, but you're still attempting to capture the same determination. Did this individual ingest cocaine? The urinalysis, the end result of the testing, turns up cocaine metabolite because the body processes it. In the hair follicle example, the result is the parent cocaine. But what you're attempting to capture in essence is the same thing. Did this employee ingest cocaine? In fact, in the hair follicle testing process and the urinalysis process, the same types of methodology were tested. The testing process for the different sample is identical. But as Judge Gayarza said, given the statutory framework within which you have to operate, is it not for that hearing officer to make those determinations? And I guess what I'm groping for is when you use the words arbitrary and capricious, our function is to review this anything that would support the conclusion reached below. If there is, we affirm. I've got that right, don't I? That's correct. So what's missing here in support of the conclusion that she reached? I think I'm trying to make the point that the fact finder focused on responses to questions that had nothing to do with the historical facts of the undisputed record in this proceeding. That's my concern. Are you critiquing the opinion? You don't like the way the opinion was written? It could have been written better with emphasis on other points? I mean, we're not reviewing the opinion. We're reviewing the conclusion, the decision of the administrative judge. I understand that. We can't reverse whatever we might suspect the true facts to have been unless there is less than substantial evidentiary support for the decision or the decision is arbitrary and capricious. Now, you started out by saying it's arbitrary and capricious, but then when you started to explain it, it sounded like you just disagree with the amount of weight given to the testimony of your expert versus the government expert. I don't think you can win on that basis. That's fact weighing. That's evidentiary conflict. Fact finder makes a choice. How is that less than substantial evidence? But the choice has to be based on a reasonable analysis of the evidence as presented. Focusing on hypothetical questions that have nothing to do with the historical facts, to me, seems quite arbitrary and not proper in terms of the analysis. You would have us say that the conduct here was unreasonable as a matter of law, and if so, therefore, arbitrary and capricious. Isn't that what you have to say? I guess I would have to adopt Your Honor's question as the predicate being valid. What's the heart of the unreasonableness? I'm still trying to get past the words here. What was it that the judge decided or said or concluded or inferred that no reasonable person, based on this testimony, could conclude? Well, I think you can infer from the conclusions in the decision that because the testing that was produced at the hearing did not follow the Health and Human Services guidelines, that there was, if you will, a disconsideration of that evidence. But the executive drug-free workplace executive order at Section 5F under adverse personnel action says that a positive drug test can be rebutted by other evidence of the non-use of drugs. Yeah, yeah, but you've got to stick with the legal standards that bind us or we can't have a useful discussion. You've got to show us where in the fact-finding by the judge was unreasonable and therefore, as Judge Young correctly says, arbitrary and capricious. Well, the agency never produced the certifying scientist. So what? Somebody else testified. There's no case that says if the lab technician doesn't testify, the test is automatically not proven. I mean, isn't this essentially the hair test favored your client, the other test favored the government, the fact-finder relied more on the government's test? Isn't that the essence here? But the science behind those tests was adequately flushed out at the hearing and... But what are you saying then that a reasonable fact-finder would have had to accept your hair test as more powerfully probative than the government's other test? I would think it would have to be the conclusions of my expert indicated that the hair analysis called into question the... Of course it did, to some extent. And the extent is exactly what the fact-finder does when the fact-finder is weighing this test against that test, this expert against that expert. There was other scientific testimony presented at the record, and that was a polygraph examination to which the petitioner subjected himself to. There were control questions. That was admitted to the record. It's the same thing. The hair test and the polygraph and his denial and all the other evidence on his side of the scale was weighed by the fact-finder against the government's test and the government's expert. I don't see how you can meet the legal standards unless you can show that the fact-finder would have had to accept your evidence as dominating the government's evidence. And I just don't see how that could be true. It seems to me fact-finder could have chosen either conclusion here, and a reviewing court would have to say, yes, that was supported by substantial evidence. Was it perfect? Who knows? Was it supported by the minimum amount of evidence required? Yes. Was it reasonable on its face? Looks that way. I'd like to respond, but I've reserved five minutes for the public. Well, why don't you respond first, and we'll preserve your five minutes. Well, we're trying to get help from you. There's some amount of sympathy in this case, and we're trying to be thorough and careful. And we understand somebody's career is involved here and their reputation, and it's not a small matter for the individual involved here. We're trying to be very careful, but we need you to help us. The petitioner's argument is that the scientific expert that testified for the agency, for the respondent, was testifying for the first time. And it was very clear that there was very little background of this particular expert witness regarding knowledge of the different matrices for testing or screening for the presence of narcotics. Our expert witness has been screening the presence of drugs since Jimmy Carter was president. But every lawyer in every case can say, my expert was better than the other expert. That can't result in a reversible error, because then in every case we'd have to reverse. But what if there was a certain quantity of evidence presented that just trumped the other side? Wouldn't that be, in those circumstances, sufficient? Possibly. That's why I'm trying to get help from you specifically. What is it that was so powerful about your evidence or so grossly deficient about the government evidence that the reasonable fact finder would have to agree with you? I thought we were able to attack certain portions of the chain of custody in this particular instance as well. And when you have a subsequent test that appears on its face to have validity, and it's been something that's scientifically accepted, there has to be a greater analysis. There is conflicting testimony, and I know that it's the law in this circuit that the prior fact turns to credibility to determine and resolve these conflicting testimonies, even with respect to experts. But I don't believe that that was adequately done in this case. But even so, all of the tests that you submitted in rebuttal all had shortcomings. Molecule tests, the DNA tests, the subsequent urine analysis, and so on. They all had shortcomings because they were done in different time stages. I would agree with respect to the subsequent urine screening that the petitioner subjected himself to. But not with respect to the hair follicle testing, because the hair follicle testing captures a greater period of time, depending on where on the body the hair is. But I thought it was less sensitive than the government's test. No, there was no evidence in the record presented to that effect at all. It's just that and there was never any evidence in the record established why HHS doesn't permit anything other than urine testing. We don't know if that's based on science, whether it's economic reasons or privacy reasons or scientific reasons. But there is a consensus in the community that hair follicle testing is reliable. Could you just take one moment and tell us what you would have us do here? What do you want us to do? To grant the petition for review and reverse the determination of the board. And then what will happen? I would assume he'd be put back to his position as a criminal. Oh, in other words, judgment for you. That's why I'm here. That wasn't just a throwaway question in a jury trial situation. I know this is not that where a verdict is against the weight of the evidence. And in those circumstances, they are few. But in those circumstances, an appellate court can order a new trial because on their independent review of the evidence, it just seems to be the fact finder's conclusion. A jury usually is so beyond what their judgment that they want to do over. We don't give do overs. If I understand the statutory scheme, correct? Yes. And. And so either you win here or we affirm. I would agree with that because I can't think of any other corrective remedy to send them back to the board with some instructions. That was the reason for my question. Thank you. All right. Let's hear from the government. We'll give you five minutes on rebuttal. Okay. May it please the court. Allison Kid Miller for the Department of Homeland Security. Mr. Mez's arguments that the hair follicle testing should have been given more weight than the agency's year analysis do not provide any basis for this court to hold that the administrative judge's decision was not supported by substantial evidence. First, the administrative judge correctly found that the hair testing was not persuasive evidence, but as the chief judge points out, this is a case not without some sympathy. Now we don't decide cases on sympathy, but it's not without some sympathy other than the positive in the normal course routine, which, which your agents do routinely as part of the drug screening program. Other than that, everything goes his way without exception. Correct? No, your honor. The hair test does not necessarily go his way. The administrative judge explained that and his own expert, Dr. Lykes, testified as well as the government's expert, Dr. Mattingly, testified that an individual could, for example, use cocaine once and have a positive urine screen and then a negative hair test. I was overly glib and you're right to point that out. I mean, it could be that you could beat the hair follicle test. It could be that you could beat the polygraph test. It could be that the chain of custody did not work. All of those things could be, but all of the tests in the routine, the normal mind run of circumstances, if we accept this follicle test as appropriate science, that tests negative polygraph tests negative. The only positive thing is, is your test. Isn't that correct? I'm hesitant to agree only because the possibility that the hair test could be negative and the urine test positive and both tests would be correct is not necessarily a matter of beating the test. Both can be true. They can be, they can be reconciled and none of these other tests, although they all, yes, said Mr. Meza was negative for cocaine. None of them conclusively disproves the agency's initial positive urine test. And that initial test has a chain of custody, which witnesses from both sides testified was absolutely intact. There was nothing at all with the chain of custody. I don't, I don't think anyone challenged the chain of custody today. That was the results of the urine test was a pretty well preserved and documented. Yes. Well, Mr. Meza's counsel this morning has mentioned that they felt they were able to attack the chain of custody. And I just wanted to be absolutely clear that witnesses from both sides testified in the administrative judge found there were no questions regarding the chain of custody. It really is a matter of that initial urinalysis versus the hair follicle test. Well, what about the other tests that were also submitted? There was the subsequent DNA test would have insufficient remnants to be able to be tested. So the only two tests which were positive were the first test that came out and all of the other tests came out negative in support of Mr. Meza. And if you start weighing the evidence, there might be more evidence on his side than on the government side. No, that's not right. Why isn't it right? As an initial matter, the government's positive test was actually a series of four tests. So just to be to be clear on that point, it was a series of testing and retesting and then sent to a second lab and tested with a from some sample. That's right. From the same sample. Now, Mr. Meza has conceded that the additional urinalysis tests are not relevant. They were taken at a later date such that they measured a window of time that did not overlap at all with the window of time measured by the government's urinalysis test. So we throw those out. That leaves the hair test and the polygraph. The polygraph, the administrative judge considered, as did the deciding official, considered that evidence but found that it was not, it did not conclusively disprove the agency's positive urinalysis. And that finding is a reasonable one supported by substantial evidence. Polygraph examinations have a whole host of factors that have to be considered, including the training of the polygraphist and the types of control questions that are used. It's, in essence, another opinion about whether the, whether Mr. Meza was telling the truth when he was given a polygraph. If you have two, excuse me, if you have two tests that really can be used to offset the one test by the government and the weight of the evidence is balanced, you're saying then that the trier of fact has the ability to say, well, I will take this test because it's probably more reliable than the other two? Is that sufficient to carry the substantial weight of the evidence? Absolutely, but the case for the agency was even stronger than that here. The polygraph and the hair follicle test were not two pluses, so to speak, for Mr. Meza, whereas the agency was one minus all of them with equal weight. These tests were of different character and different weight to be ascribed to the different tests. And as I've already explained, the hair follicle test, for example, Dr. Laikisa, Dr. Mattingly, even a representative from Dr. Laikisa's lab who spoke with the deciding official all said you can have a situation where you have a positive urinalysis and then a negative hair follicle test. They can be reconciled, even if the hair follicle tests weren't less persuasive, which it was. That cannot be true of the first urinalysis that was done by the government? I'm not sure I understand. The quality of that test is 100 percent certain? The first urinalysis? Yes, Your Honor. Dr. Mattingly testified in the administrative judge, summarized that on page 8 of the administrative joint appendix, rather, that Dr. Mattingly testified that that gas, the GCMS, or the gas chromatography mass spectrometry test, is essentially 100 percent, that it's not going to mistake cocaine for any other drug. If you find cocaine, that urine sample had cocaine in it. You put that together with the chain of custody that shows this was Mr. Mez's urine and the agency's test is sound. Let me ask you a hypothetical question. Assume, I know you're saying not this case, but assume that a government employee is you have to assume that that's the case. Now, as I understand your argument, there's no way that that employee could avoid being fired other than to have immediately gotten a private test of the same sort, also using urine, with the contrary result. So that the burden then is on every employee to run out every time tested by the government and hire a private lab to test them in the same fashion, because otherwise no evidence they could conceivably gather will be viewed as sufficient. No, I would not agree with that. Again, what would be sufficient? There are a number of things that could occur. This court and the MSPB have dealt with cases in which the employee has suggested something went wrong in the testing procedure, or made some observation during collection, or there was something not quite right with the chain of custody. If the testing equipment itself had revealed some malfunction in which it was giving false positives, that could be the kind of thing that could overturn or exonerate an employee in this kind of situation. Indeed, Robert Rutt, the deciding official in this case, did some investigation to determine whether the machine that tested Mr. Meza's sample had tested other samples as positive before Mr. Meza's. I think he looked back, he got information on something like the 15 or 16 tests before Mr. Meza's, to investigate this very possibility that the machine might be giving false positives. So these are just a couple of other examples of situations which could arise that could exonerate an employee. But the employee won't know what the track record of the lab machine is. The employee is going to know that this morning I got tested for urine. A few days later, somebody from the agency is going to call the employee and say, you know what, your test was positive. At that point, the employee doesn't know anything else. So I'm bothered by the practical implication of what you're saying is that all employees, every time they're tested, would have to go out and get a private test to protect against the risk of a false positive in the government test. Well, that's not what I'm saying. In this case, the agency did a second test automatically, without Mr. Meza making a request. In other situations, an employee is contacted after the initial testing and confirmation test and informed that the result is positive. In those cases, the employee can then ask the agency to retest a second time. Now, again, here that was done automatically by the agency before Mr. Meza was ever informed of the results. So if we're speaking hypothetically about, is every employee going to be under some kind of agency? What can an agency do to ensure that its employees are complying with the government's drug policies, but to give an employee a second test? What about a second test? A second sample? In other words, I'm the employee. I'm tested today. Two days later, the lab says test positive. Why isn't the protocol that, okay, new sample, new test? For the agency to initiate that? I don't know the answer to why that is not the protocol. Why couldn't it be done? Obviously, it would cost some money. It would be some burden on the agency, but other than those obvious costs, why wouldn't that be a good way to protect employees from the risk of false positives, and in the case where it isn't a false positive, to have extremely strong corroborating evidence that the employee indeed did have the remains of cocaine in their system? Well, I don't know that I can answer why that shouldn't be the policy. Perhaps... The question, couldn't it be the policy? Is there any reason why it couldn't be done? It could, conceivably. It's not the current policy. Because you already test that sample twice, right? The first sample that was taken? Exactly. Pardon me. So you test it twice. Why, as Judge Michel points out, why not do the second test a couple of days later on a different sample to confirm the first sample's accuracy, instead of testing the same sample twice? Well... Go ahead. I'm sorry. Answer this question, and then we'll get to the next one. Okay. Again, perhaps that could be done. It's not the current policy, and in addition to the cost concerns, in that kind of situation, to make that standard protocol, you then have a situation where you have to repeat this whole process of going back out to the agency with a collector, sending that sample back. You might have an issue of windows of time that no longer are overlapping. In other words, the second sample may no longer be testing or picking up the same drug use that the first sample picked up. So those are just a couple of reasons why that might be more complicated. Again, maybe HHS might decide that needs to be policy one day, but again, it's not currently the policy. Under the current policy, that first sample, the urinalysis, was tested twice, and each of those tests, an initial test and a confirmation test, so four separate tests here to confirm that that urine was positive for cocaine, and then Mr. Meza signed the chain of custody forms stating that that was his urine that he provided to the agency, and that held up. Let me give you another hypothetical. Suppose that I'm an employee, and the collector and I had a big clash, and suppose that the collector lines the inside of the sample jar with cocaine. So it is my urine, chain of custody was perfect, machines worked perfectly, lab tech was perfect, all four tests were done, including the spectrograph and so on, but the problem is the sample was contaminated from the very start. Now, in your scenario, unless I know that and can prove that, I'm going to get fired even though I'm totally innocent, right? Possibly. Now, in your hypothetical, one of the premises was you've had a clash with the collector. Presumably, when the medical review officer calls up this hypothetical employee and says, you've tested positive, is there any information at all you want to give me about this test? That would be a prime opportunity for that employee to say, well, I had this clash with the collector, and you need to look into it. If I could go back a round of questions. You gave the answer that I expected with respect to a second test, because of course a second test may not reveal the cocaine that was in the urine due to the passage of time, but you haven't, other than the fact that you don't do it, you haven't suggested a reason why what the chief judge suggested could not be done, and that is this. At the time of testing, take two samples so they're the same time. Government preserves the chain of custody and tests one. You say there were several tests. Actually, there are tests of increasing refinement culminating in this gas chromatography mass spectrometry test, which we do appear to accept as confirmation of you go through your increasing sophistication on test one. If that comes out positive, it would be more expensive, but it would be a considerably better process to inform the employee and say, and now we're going to test the second one, and we're going to split it up into two. You can have part of it if you want. Test it yourself. We're going to test our part, which is the same urine given at the same time, and if that is confirmed, that's serious business. That could be done. That protocol could be done, though it's marginally more expensive, and it is a guarantee against all but the chief's last hypothetical, but you don't do it. That is done by some agencies. I believe it's referred to as split specimen testing, and the HHS guidelines say that an agency may adopt that type of testing, but is not required to. What agencies do that? Your candid answer is very helpful. I don't know which agencies. We could find out, I'm sure. Presumably, HHS has made that discretionary for the agency rather than mandatory for good reason. Expense is the only one I can think of. Also, its guidelines have scientific bases, and they get notice and comment and review scientific principles as well as things like cost and other more efficiency aspects of testing. Are you suggesting that all courts are necessarily bound by the judgment call made by HHS and the content of their guidelines? No, not necessarily. What I am suggesting, though, is that in this case, we have a test that nobody questions was done properly in accordance with the applicable guidelines, and the competing test, the hair follicle test, in addition to not being approved by HHS and this particular lab not being an approved lab, etc., those two test results can be reconciled, and with that being the case, substantial evidence does support the administrative judge's decision, and we ask that that decision be affirmed. Thank you. Thank you. Mr. McAllister, rebuttal. Yes, please. Thank you. In this particular case, the notifications of the petitioner about the dirty urine, if you will, came three days after his initial donation of the urine sample, so that eliminates that 72-hour window that was testified to at the hearing regarding an employee going out and vindicating themselves. I'm concerned that there is, in this particular circumstance, there's nothing more, there's nothing additional, there's nothing any greater that this petitioner could have done, nor any other federal employee could have done, in an attempt to rebut the evidence, if you will, which the executive order allows federal employees to do. There's an interesting corollary to this story, that at the same time that the first action against the petitioner, he holds a commercial pilot's license that was flushed out at the record below, and it's identified in the brief, and the FAA requires him to hold a second-degree medical certificate, which requires drug testing and the like. He voluntarily disclosed to the FAA that he had given a positive test for cocaine in a random test screening with the agency, and they proposed summarily to suspend his pilot's license. Based on the same evidence that was presented at the record here, the FAA refused to do that and allowed him to obtain his commercial pilot's license. That's what gives me pause, that the conclusions of the board are somewhat arbitrary. I heard Judge Goharza indicate that there was no attack on the chain of custody. I would argue that there were two attacks on the chain of custody. One attack on the chain of custody was inherent in our argument about the subsequent hair test that turned up negative for the presence of cocaine. That's one. That's the only mutually exclusive, I would argue. But number two, the agency did not call a certifying scientist who certified the results of the Northwest Toxicology Analysis, and we had asked for an adverse, a missing witness inference to be charged against the agency to the judge at the hearing, and that was never done. Yes, but this was someone who was not then in the custody of the agency, was not an employee of the agency at that time. Isn't that right? He was, neither was the collector. These were contract employees. But you don't usually give a missing witness instruction under those circumstances. Well, the agency saw fit to call the collector, but they didn't call the scientist who did the analysis and who could have described what safeguards were taken in the lab versus the safeguards taken in the collection process. There could have been contamination in the lab, but the agency didn't call that witness. There was testimony at the hearing that that witness was still employed at the lab. Have you any authority, I see none in your brief, but I may have missed it. Have you any authority that it is given to this court to impose additional due process requirements on the agency in circumstances such as this? Additional due process? Yes. I'm not aware of any authority. I appreciate the candid response, nor am I. I know there's been arguments about the cost effectiveness. I know the agency could incur additional costs in the testing process, but the cost to my client who had a salary, we're hearing over $90,000 a year, had wonderful prospects of a law enforcement retirement, the cost to him would have just been catastrophic. I'd weigh back the balance of my time. We thank both counsel. We'll take the case under advise.